1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

ESTATE OF VERL A. BRANTNER,

8

Plaintiff,

9

v.

10

OCWEN LOAN SERVICING, LLC,

11

Defendant.

C17-582 TSZ

ORDER

12        THIS MATTER comes before the Court on a motion for summary judgment,

13   docket no. 150, brought by defendant Ocwen Loan Servicing, LLC ("Ocwen"), and a

14   motion for partial summary judgment, docket no. 148, brought by plaintiff, the Estate of

15   Verl A. Brantner (the "Estate").  Having reviewed all papers filed in support of, and in

16   opposition to, each motion, the Court enters the following order.

17   **Background**

18        This case involves a residence in Arlington, Washington that was destroyed by

19   fire, and the handling of a claim under, and the proceeds of, a "forced" or lender-placed

20   hazard insurance policy.  _See_ Tr. (Oct. 29, 2018) at 98:17-20, 99:6-14, 100:1-103:9

21   (docket no. 117).  After a three-day jury trial, the Estate was awarded $88,159.40 in

22   actual damages based on a finding that Ocwen had violated Washington's Consumer

23

ORDER - 1

Protection Act ("CPA").  *See* Verdict (docket no. 83).  The jury's liability determination

was based on its conclusion that Ocwen had engaged in a violation of Washington's

Consumer Loan Act ("CLA").  *See id.*; *see also* Instruction No. 13B (docket no. 75).  On

appeal, the United States Court of Appeals for the Ninth Circuit concluded, as a matter of

law, that Ocwen did not violate the three provisions of the Consumer Loan Act on which

the Estate premised its "per se" CPA claim, namely RCW 31.04.290(1)(b), (c), and (e),[1]

or a related regulation.  *See Estate of Brantner v. Ocwen Loan Servicing, LLC*, 799 Fed.

App'x 553 (9th Cir. 2020).  The Ninth Circuit reversed and remanded for a new trial,

reasoning that, because (i) the three provisions of the Consumer Loan Act did not apply

to Ocwen's handling of the insurance claim and proceeds, and (ii) the Estate had relied at

trial on a CLA-based "per se" theory to prove the "public interest" element of its CPA

claim, the appellate court could not conclude, on a "more probable than not" basis, that a

properly instructed jury would have reached the same verdict.  *Id.* at 553-54.

On remand, the Estate was permitted, without objection, to amend its operative

pleading to (i) revive a previously dismissed claim under the Real Estate Settlement

---

[1] The Estate has repleaded a claim under subsection (1)(e), which requires a residential mortgage loan servicer to "[p]romptly correct any errors and refund any fees assessed to the borrower resulting from the servicer's error."  RCW 31.04.290(1)(e).  The Ninth Circuit held that (1)(e) is "inapplicable to Ocwen's [alleged] failure to make a timely insurance claim or to apply insurance proceeds to the balance of the loan expeditiously."  *Estate of Brantner*, 799 Fed. App'x at 553-54.  As explained by the Ninth Circuit, the statutory provision "refers to corrections and refunds of fees imposed on the borrower, not to a loan servicer's mistakes in handling insurance policies it obtained to protect its collateral."  *Id.* at 554.  In response to Ocwen's motion for summary judgment, the Estate has not identified any "error" other than the alleged insurance blunders, which the Estate is estopped from pursuing under subsection (1)(e) by the Ninth Circuit's decision.  Thus, as to the Estate's claims premised on RCW 31.04.290(1)(e), Ocwen is entitled to summary judgment, and those claims are DISMISSED with prejudice.

1   Procedures Act ("RESPA"), and (ii) to restate its claims under the Consumer Loan Act

2   and the CPA.  *See* Minute Order (docket no. 143); Pl.'s Mot. at 1 (docket no. 141).

3   Ocwen now seeks summary judgment in its favor as to all three of the Estate's claims,

4   which are set forth in the Second Amended Complaint, docket no. 144.  In contrast, the

5   Estate requests partial summary judgment holding, as a matter of law, that Ocwen "was

6   expected" to (i) "take all appropriate action to recoup all available hazard insurance

7   proceeds"; and (ii) "take all necessary steps to ensure any hazard insurance claim was

8   filed and settled as expeditiously as possible."  Pl.'s Mot. at 1 (docket no. 148).

9   **Discussion**

10  **A.      Standard for Summary Judgment**

11          The Court shall grant summary judgment if no genuine issue of material fact exists

12  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

13  Summary judgment is warranted if, after accepting the adverse party's "affirmative

14  evidence" as true and drawing all "justifiable inferences" in its favor, the record, taken as

15  a whole, could not lead a rational trier of fact to find for the non-moving party on matters

16  as to which such party will bear the burden of proof at trial.  *See* *Matsushita Elec. Indus.*

17  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also* *Anderson v. Liberty Lobby,*

18  *Inc.*, 477 U.S. 242, 255, 257 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

19  **B.      RESPA**

20          The Estate alleges that Ocwen violated 12 U.S.C. § 2605(k)(1)(E) by requiring,

21  contrary to 12 C.F.R. § 1024.38(b)(1)(vi), that the Estate provide a form signed by the

22  decedent, Verl A. Brantner, authorizing release of information to the Estate's lawyer,

23

James Jameson.[2]  *See* 2d Am. Comp. at ¶¶ 4.2(a)-(g) (docket no. 144).  The cited statute provides that a "servicer of a federally related mortgage" shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."  12 U.S.C. § 2605(k)(1)(E).  The regulation at issue reads as follows:

> (a) Reasonable policies and procedures.  A servicer shall maintain policies and procedures that are reasonably designed to achieve the objectives set forth in paragraph (b) of this section.
>
> (b) Objectives–
>
>> (1) Accessing and providing timely and accurate information.  The policies and procedures required by paragraph (a) of this section shall be reasonably designed to ensure that the servicer can:
>>
>> . . .
>>
>> (vi)(A) Upon receiving notice of the death of a borrower or of any transfer of the property securing a mortgage loan, promptly facilitate communication with any potential or confirmed successors in interest regarding the property;
>>
>>> (B) Upon receiving notice of the existence of a potential successor in interest, promptly determine the documents the servicer reasonably requires to confirm that person's identity and ownership interest in the property and promptly provide to the potential successor in interest a description of those documents and how the person may submit a

---

[2] This RESPA claim differs from the one previously asserted by the Estate.  The earlier RESPA claim was based on a provision that requires a servicer to take "timely action to respond to a borrower's requests."  *See* 12 U.S.C. § 2605(k)(1)(C); *see also* Am. Compl. at ¶ 4.2 (docket no. 18).  The prior RESPA claim was dismissed on the merits because the two letters that the Estate attempted to treat as "qualified written requests" for purposes of § 2605(k)(1)(C) were not sent to the proper address for Ocwen.  *See* Tr. (Oct. 24, 2018) at 11:14-12:24 (docket no. 116).  The Estate sought review of this decision, but subsequently voluntarily dismissed its appeal.  *See* Appellant's Mot. & Order (docket nos. 17 & 18), *Estate of Brantner v. Ocwen Loan Servicing, LLC*, No. 18-36012 (9th Cir. May 28 & June 6, 2019).  The Court's prior ruling is therefore law of the case.

written request under § 1024.36(i) (including the appropriate address); and

(C) Upon the receipt of such documents, promptly make a confirmation determination and promptly notify the person, as applicable, that the servicer has confirmed the person's status, has determined that additional documents are required (and what those documents are), or has determined that the person is not a successor in interest.

12 C.F.R. §§ 1024.38(a) & (b)(1)(vi).  To summarize, this regulation requires a servicer like Ocwen to maintain policies and procedures that are reasonably designed to ensure that it can promptly (i) facilitate communication with an alleged successor in interest, (ii) inform the alleged successor in interest about the documents required to confirm its status, and (iii) make a determination confirming or contesting such status or seeking further proof.

Ocwen contends that this regulation does not provide the Estate with any private right of action.  The Court agrees.  *See* *Plouffe v. Bayview Loan Servicing, LLC*, No. 15-5699, 2018 WL 2984874, at *20 (E.D. Pa. June 13, 2018) (citing Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, at 10697-98 (Feb. 14, 2013) ("The Bureau . . . will be able to supervise servicers . . . to assure compliance with these requirements but there will not be a private right of action to enforce these provisions.")); *Smith v. Nationstar Mortg.*, No. 15-13019, 2015 WL 7180473, at *4 (E.D. Mich. Nov. 16, 2015) (explaining that, contrary to an original proposal to enact § 1024.38 under RESPA § 6, concerns that private litigation would lead to over-enforcement of the statute caused the Bureau of Consumer Financial Protection to change course and adopt § 1024.38 under RESPA § 19 and two provisions

of the Dodd-Frank Act, which do not create any private cause of action); *Deming-Anderson v. PNC Mortg.*, 119 F. Supp. 3d 635, 640 (E.D. Mich. 2015); *see also In re Crockett (Crockett v. Nationstar Mortg., LLC)*, Nos. 19-101 & 19-10030, 2020 WL 425388, at *7 (Bankr. D.D.C. Jan. 27, 2020); *Covino v. Wells Fargo Bank*, No. 2:16-cv-2264, 2018 WL 4616071, at *5 (D.N.J. Sept. 26, 2018); *Lackie v. PHH Mortg. Corp.*, No. 3:17-CV-377, 2018 WL 4409799, at *2 (N.D. Tex. Sept. 17, 2018); *Mastin v. Ditech Fin., LLC*, No. 3:17cv368, 2018 WL 524871, at *7 (E.D. Va. Jan. 23, 2018); *In re Wiggins (Wiggins v. Hudson City Sav. Bank)*, Nos. 12-26993 & 15-1938, 2016 WL 7115864, at *4 & n.2 (Bankr. D.N.J. Dec. 6, 2016); *Joussett v. Bank of Am., N.A.*, No. 15-6318, 2016 WL 5848845, at *5 (E.D. Pa. Oct. 6, 2016); *Austerberry v. Wells Fargo Home Mortg.*, No. 15-13297, 2015 WL 8031857, at *5 (E.D. Mich. Dec. 7, 2015); *Andrade v. Carrington Mortg. Servs., LLC*, No. 1:15-cv-713, 2015 WL 7108119, at *3 (W.D. Mich. Nov. 13, 2015); *Sharp v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-369, 2015 WL 4771291, at *6-7 (D.N.H. Aug. 11, 2015).

Moreover, even if the Estate could assert a claim under § 1024.38, it has failed to make the requisite allegations to proceed.  The Estate does not assert that Ocwen failed to maintain policies and procedures or that its policies and procedures were not "reasonably designed" to ensure it could promptly take the steps outlined in the regulation.  *See* 2d Am. Compl. at ¶¶ 4.2(a)-(g) (docket no. 144); Pl.'s Resp. at 7-11 (docket no. 162). Rather, the Estate's claim is that, in July 2014, Ocwen unreasonably required, as a condition precedent to disclosing loan information to attorney James Jameson, a form signed by Verl Brantner, who died in November 2013.  *See* Pl.'s Resp. at 10 (docket

no. 162). The Estate cites no statutory or regulatory provision that would preclude a

servicer from demanding certain documentation before providing a person's loan

information to a third party, and any deficiency in Ocwen's policies (and/or any failure to

follow its procedures) in this specific regard cannot form the basis of a cause of action

under § 1024.38. *See* *Mastin*, 2018 WL 524871, at *6 (holding that allegations of "only

facts that might support isolated instances where [the servicer's] procedures may have

been deficient" did not state a claim under § 1024.38). Ocwen is entitled to summary

judgment as to the Estate's RESPA claim, which is DISMISSED with prejudice.

**C.**     **Consumer Loan Act**

The Estate's CLA claim is brought under RCW 31.04.250,[3] RCW 31.04.027(1)(a)

& (b),[4] RCW 31.04.290(1)(d),[5] and WAC 208-620-900(1).[6] *See* 2d Am. Comp. at ¶ 4.7

---

[3] RCW 31.04.250 was repealed in 1992. *See* Laws of 1991, ch. 208, § 23. A different section with transposed numbering indicates: "Each loan made to a resident of this state by a licensee, or persons subject to this chapter, is subject to the authority and restrictions of this chapter." RCW 31.04.025(1). The Court assumes that the Estate meant to refer to this provision rather than the repealed one. *See* 2d Am. Compl. at ¶¶ 4.4 & 4.5 (citing RCW 31.04.025).

[4] "It is a violation of this chapter for a licensee, its officers, directors, employees, or independent contractors, or any other person subject to this chapter to: (a) Directly or indirectly employ any scheme, device, or artifice to defraud or mislead any borrower, to defraud or mislead any lender, or to defraud or mislead any person; (b) Directly or indirectly engage in any unfair or deceptive practice toward any person . . . ." RCW 31.04.027(1)(a) & (b).

[5] "A residential mortgage loan servicer must comply with the following requirements: . . . (d) The servicer must make reasonable attempts to comply with a borrower's request for information about the residential mortgage loan account and to respond to any dispute initiated by the borrower about the loan account." RCW 31.04.290(1)(d).

[6] "A violation of an applicable state or federal law, regulation, or program is a violation of this act [*i.e.*, the Consumer Loan Act]. In addition to complying with all other provisions of this act, you must comply with the following: (a) Chapter 61.24 RCW and any other applicable state or federal law, regulation, and program[; and] (b) The federal Servicemembers Civil Relief Act." WAC 208-620-900(1).

ORDER - 7

1    (docket no. 144).  Ocwen argues that the Consumer Loan Act does not provide a

2    stand-alone, private right of action, citing *Saepoff v. N. Cascade Tr. Servs., Inc.*,

3    No. 2:17-CV-957, 2019 WL 4597504 (W.D. Wash. Sept. 23, 2019), *appeal filed*,

4    No. 20-36031 (9th Cir. Nov. 27, 2020).  The Court agrees.

5         RCW 31.04.165 vests "broad administrative discretion" in the Director of

6    Financial Institutions to interpret the CLA, adopt necessary rules, and ensure compliance

7    by licensees, including by bringing legal action to enjoin acts or practices that violate the

8    statute.  *See* RCW 31.04.165.  The Director's actions are subject to review under

9    Washington's Administrative Procedure Act, RCW Chapter 34.05.  *See* RCW 31.04.202.

10   The Consumer Loan Act contains no provision allowing an individual to sue, but rather

11   explicitly refers to the CPA, setting forth a legislative finding that "the practices governed

12   by this chapter are matters vitally affecting the public interest for the purpose of applying

13   the consumer protection act."  RCW 31.04.208.  The CLA further provides that "[a]ny

14   violation of this chapter is not reasonable in relation to the development and preservation

15   of business and is an unfair and deceptive act or practice and unfair method of

16   competition in the conduct of trade or commerce in violation of RCW 19.86.020."  *Id.*

17   Given this indication of legislative intent that a violation of the Consumer Loan Act

18   constitutes a basis for pursuing a "per se" CPA claim, the Court concludes that no

19   separate private right of action exists under the CLA.  *See Saepoff*, 2019 WL 4597504, at

20   *4 (citing *Ives v. Ramsden*, 142 Wn. App. 369, 389, 174 P.3d 1231 (2008)); *see also*

21   *Pain Diagnostics & Rehab. Assocs., P.S. v. Brockman*, 97 Wn. App. 691, 697-98, 988

22

23

ORDER - 8

1    P.2d 972 (1999) (holding, for similar reasons, that private lawsuits for violations of the

2    insurance statutes and regulations must be brought under the CPA).

3           The Estate's argument in response to Ocwen's Rule 56 motion does not suggest a

4    different result; the Estate states merely that RCW 31.04.208 and WAC 208-620-900(1)

5    together stand for the proposition that a CLA violation is potentially "compensable"

6    under the CPA.  *See* Pl.'s Resp. at 12 (docket no. 162).  Ocwen is entitled to summary

7    judgment as to the Estate's stand-alone CLA claim, which is DISMISSED with prejudice.

8    **D.    Consumer Protection Act**

9           To establish a violation of the CPA, a private plaintiff must prove:  (i) the

10   defendant engaged in an unfair or deceptive act or practice; (ii) such act or practice

11   occurred within a trade or business; (iii) such act or practice affected the public interest;

12   (iv) the plaintiff suffered an injury to his or her business or property; and (v) a causal

13   relationship exists between the defendant's act or practice and the plaintiff's injury.

14   *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785-93,

15   719 P.2d 531 (1986).  With respect to the third element, a plaintiff may establish that the

16   act or practice at issue is "injurious to the public interest" by showing that it (i) violates a

17   statute incorporating the CPA or containing a "specific legislative declaration of public

18   interest impact," or (ii) injured other persons or had or has the capacity to injure other

19   persons.  *See* RCW 19.86.093.  With regard to the first "per se" theory, the Estate relies

20   solely on the Consumer Loan Act as a statute containing the requisite "specific legislative

21   declaration of public interest impact."  Ocwen argues that the Estate cannot prove the

22

23

1    "public interest" element via either the "per se" approach or the second "capacity to

2    injure" method.  The Court agrees.

3         **1.    The Undisputed Facts**

4         The Estate's CPA claim must be examined in the context of the following

5    undisputed facts.  In October 2011, in connection with a $161,600 loan from Leader One

6    Financial Corporation, Verl Brantner executed a Note and a Deed of Trust relating to the

7    Arlington residence; the loan was originally serviced by GMAC Mortgage, LLC.  *See*

8    Ex. 1 to Wright Decl. (docket no. 151); *see also* Note, Ex. A to Pierson Decl. (docket

9    no. 149).  Ocwen began servicing the loan in February 2013.[7]  Flannigan Decl. at ¶ 8,

10   Ex. 12 to Wright Decl. (docket no. 151).  Verl Brantner's last payment toward the loan at

11   issue was on November 9, 2013.  *See* Ex. E to Pierson Decl. (docket no. 163); *see also*

12   Stipulated Fact No. 5, Pretrial Order at 2 (docket no. 67) & Instruction No. 4 (docket

13   no. 75) [hereinafter "Stip. Fact"].

14        After Verl Brantner died, Ocwen exercised its contractual right to procure hazard

15   insurance for the Arlington residence.  *See* Deed of Trust at ¶ 7, Ex. 1 to Wright Decl.

16   (docket no. 151); Stip. Facts Nos. 4 & 7.  The policy, which in effect from December 5,

17   2013, until December 5, 2014, had a limit of $156,033.00.  *See* Ex. 2 to Wright Decl.

18   (docket no. 151); Stip. Facts Nos. 8 & 10.  The loan went into default in January 2014.

19

20   _____

21   [7] About a year later, in late February 2014, the Deed of Trust was assigned to Ocwen.  2d Am.
     Compl. at ¶ 3.11 (docket no. 144).  Ocwen merged with PHH Mortgage Corporation in
     June 2019, and servicing of the loan was transferred to PHH.  *See* Flannigan Decl. at ¶¶ 5 & 18

22   (docket no. 151).

23

Stip. Fact No. 6.  In March 2014, during the coverage period, the Arlington residence was

damaged by fire.  *See* Stip. Fact No. 11.  In April 2014, the management at Ocwen

approved the loan for foreclosure.  *See* Ex. E to Pierson Decl. (docket no. 163).

On June 16, 2014, James Jameson, then the Estate's lawyer, crafted a letter that

stated in relevant part as follows:

> I am writing on behalf of the Estate of Verl A. Brantner. . . .  I have received a February 18, 2014, statement indicating the principal balance on the loan to be slightly in excess of $156,000.00.  It is my understanding that after Mr. Brantner's death, there was a fire at the property.  I presume that insurance proceeds were paid to Ocwen for the fire loss.

> Please forward what balance, if any, remains after payment of insurance proceeds on this loan.

Ex. O to Pierson Decl. (docket no. 163).  The letter, however, was mailed to an address

different from the one to which "qualified written requests, notices of error, and/or

requests for information" should have been sent.  *See* Tr. (Oct. 24, 2018) at 11:21-12:6

(docket no. 116) (ruling that the June 2014 letter was mailed to the wrong address); *see*

*also* *supra* note 2.  Nevertheless, on July 1, 2014, Ocwen responded by faxing a Third-

Party Authorization and Agreement to Release form.  *See* Ex. N to Pierson Decl. (docket

no. 163).  On July 10, 2014, Irene Brantner executed the form, reflecting her wish that

Ocwen release information about the loan to the Estate's attorney.  *See id.*  Irene Brantner

did not, however, become the personal representative of the Estate until February 2015.

Stip. Fact No. 14.

On February 19, 2015, the Estate's lawyer sent another letter to Ocwen, again to

the wrong address.  *See* Tr. (Oct. 24, 2018) at 11:14-20 (docket no. 116) (inquiring

1    whether the Estate conceded that the letter was not mailed to the right address and

2    obtaining an affirmative response from trial counsel for the Estate).  Approximately a

3    week later, on February 26, 2015, Ocwen sent the Estate's attorney a "Reinstatement

4    Quote," indicating that the amount due to reinstate the loan was $20,613.92, and that

5    Matthew Rosendahl had been assigned as the "relationship manager" for the account.

6    Ex. K to Pierson Decl. (docket no. 163).  The Estate contends that Rosendahl was not

7    timely identified by Ocwen.[8]

8          On March 11, 2015, QBE Insurance Corporation ("QBE"), which issued the

9    lender-placed hazard insurance policy, opened a claim relating to the fire damage.  _See_

10   Ex. B to Pierson Decl. (docket no. 163).  The parties agree that James Jameson, the

11   Estate's attorney, contacted QBE on March 11, 2015, to inform it of the fire.  Stip. Fact

12   No. 15.  At that time, Jameson learned that a third-party inspection service hired by

13

14   _____

15   [8] The Estate asserts that Rosendahl should have been identified about a year earlier, soon after
     entry of a Consent Judgment against Ocwen in a District of Columbia proceeding, which
16   required Ocwen to "establish an easily accessible and reliable single point of contact . . . for each
     potentially-eligible first lien mortgage borrower so that the borrower has access to an [Ocwen]
17   employee . . . to obtain information throughout the loss mitigation, loan modification, and
     foreclosure processes."  Ex. J to Pierson Decl. (docket no. 163 at 64).  The Consent Judgment
18   was entered on February 26, 2014.  _Id._ (docket no. 163 at 63).  The Estate fails to explain,
     however, how any delay in identifying a "single point of contact" adversely affected it, given
19   that Irene Brantner was not the personal representative for the Estate until February 2015, and
     could not have authorized any communication between Ocwen's "single point of contact" and
20   the Estate's lawyer until shortly before the relationship manager (Rosendahl) was designated, on
     February 26, 2015.  Moreover, the Estate has articulated no basis for concluding that a lack of
21   compliance with a Consent Judgment issued by the District of Columbia would constitute a
     violation of Washington's Consumer Loan Act or Washington's Consumer Protection Act.
22   Thus, Ocwen is entitled to summary judgment with respect to the Estate's CPA claim alleging
     breach or contempt of the District of Columbia Consent Judgment, and such claim is
     DISMISSED with prejudice.

23

1   Ocwen had earlier, on the same day, reported the fire damage to QBE.  Jameson Decl. at

2   ¶ 10 (docket no. 46).  In September 2015, an insurance adjuster estimated that the

3   "replacement cost" for the Arlington residence was $161,659.05.  Ex. 4 to Wright Decl.

4   (docket no. 151).  On September 22, 2015, QBE issued a check payable to Ocwen in the

5   amount of $132,348.33, which reflected the "actual cash value" for the claim after

6   subtracting from the "replacement cost" the $1,000 deductible and $28,310.72 in

7   depreciation.  *See* Exs. 4 & 5 to Wright Decl. (docket no. 151); Stip. Facts Nos. 20 & 21.

8   On October 14, 2015, Ocwen sent Irene Brantner an email indicating that it had "received

9   a payment on 09/28/2015 for the amount of $132,348.33."  Ex. 6 to Wright Decl. (docket

10   no. 151); Stip. Fact No. 22.

11          On November 25, 2015, Ocwen sent a letter to the Estate indicating that its

12   Insurance Loss Department had been informed on April 13, 2015, of a hazard claim

13   concerning the Arlington residence.  Ex. 7 to Wright Decl. (docket no. 151).  The Estate

14   alleges that this representation concerning when the Insurance Loss Department learned

15   of the hazard claim was false.  The November 2015 letter further stated that Ocwen had

16   "tried on numerous occasions to contact [the Estate] by phone to discuss [its] hazard

17   claim," and it contained a telephone number for the Insurance Loss Department.  *Id.*  On

18   December 21, 2015, Ocwen generated a "Payoff Quote."  Ex. 9 to Wright Decl. (docket

19   no. 151).[9]

20

21   [9] The Estate denies receiving this "Payoff Quote" in December 2015.  *See* Pl.'s Resp. at 18

22   (docket no. 162).  The cover sheet to the "Payoff Quote" reflects, on the "To" line, a fax number
    of 770-383-4366, Ex. 9 to Wright Decl. (docket no. 151), which is Ocwen's own number, rather

23

1    In January 2016, Irene Brantner executed a Mortgagor - Partial Payoff Affidavit.

2  Ex. U to Pierson Decl. (docket no. 163); Stip. Fact No. 24.  The Affidavit authorized

3  Ocwen "to apply Hazard Suspense funds (Insurance Claim funds) in the amount of

4  $132,348.33 toward the payoff on the loan."  Ex. U to Pierson Decl. (docket no. 163).  It

5  further contained a representation by Irene Brantner that she understood "these funds are

6  not sufficient to pay off the aforementioned loan," and that she "will be responsible for

7  any/all additional funds needed."  _Id._  The amount set forth on the Affidavit to "pay off

8  and satisfy the loan" was $29,251.67.  _Id._; _see_ Stip. Fact No. 25.  This sum was less than

9  the total actually due; Ocwen had calculated a payoff amount of $186,879.79 (as of

10  January 31, 2016), meaning that, after subtracting the insurance proceeds, another

11  $54,531.46 would have been owed, but Ocwen offered a discount to the Estate if the loan

12  was satisfied by January 24, 2016.  _See_ Ex. 9 to Wright Decl. (docket no. 151).

13    In February 2016, a new lawyer for the Estate, Michael Watkins, sent Ocwen a

14  letter that read in relevant part as follows:

15    Please be advised that we represent Ms. Irene Brantner, the Personal
      Representative of the Estate of Verl A. Brantner . . . .

16
      As noted above, the subject property was completely destroyed by fire on
17    March 23, 2014.  We are interested in reviewing our options regarding

18  _____

19  than that of the Estate or its attorney, _see_ Ex. T to Pierson Decl. (docket no. 163).  The Estate,
    however, concedes that, on or about December 21, 2015, it received from Ocwen a partial payoff
20  affidavit form, which contained a payoff amount.  _See_ Pl.'s Resp. at 18 (docket no. 162); Stip.
    Fact. No. 23; Ex. 9 to Wright Decl. (docket no. 151 at 109-10) (indicating a successful facsimile
21  transmission).  The Court therefore concludes that whether the "Payoff Quote" was properly
    faxed to the Estate is not a material fact for purposes of ruling on Ocwen's motion for summary
22  judgment.

23

rebuilding the subject property with insurance benefits payable under the forced placed insurance policy . . . .

Ex. 11 to Wright Decl. (docket no. 151).  Between March 8, 2016, and June 30, 2016, Ocwen fielded calls from James Jameson and sent updated payoff information to the Estate.  *See* Ex. 8 to Wright Decl. (docket no. 151).  On June 30, 2016, the Estate's attorney informed Ocwen via telephone that the Estate would be "paying off the loan." *See id.* (docket no. 151 at 99).

On August 11 or 12, 2016, Ocwen credited the insurance proceeds toward the loan as follows.  The first $49,779.68 of the insurance funds were used to bring the loan current by applying this sum to the delinquent monthly payments for December 1, 2013, through August 1, 2016.  *See* Flannigan Decl. at ¶ 14, Ex. 12 to Wright Decl. (docket no. 151); *see also* Ex. 8 to Wright Decl. (docket no. 151 at 100) (indicating that, on August 22, 2016, the Estate's lawyer was telephonically advised that the insurance funds were posted on August 12, 2016).  These monthly payments included any mortgage insurance premiums, taxes, hazard insurance premiums, interest, and amortization of the principal balance.  *See* Deed of Trust at ¶ 3, Ex. 1 to Wright Decl. (docket no. 151). After the loan was reinstated, the remaining $82,568.65 in insurance proceeds was applied to reduce the principal balance.  Flannigan Decl. at ¶ 15 (docket no. 151).  As of September 1, 2016, the principal balance of the loan was $64,996.16.  *Id.* at ¶ 16.  No payment has been made toward the loan since the insurance funds were credited.  *See id.* at ¶ 20.  This litigation commenced on April 14, 2017.  *See* Compl. (docket no. 1).  The

1  parties have agreed that, as of August 16, 2018, the amount outstanding on the loan was

2  $80,626.40, and that interest and charges continue to accrue.  Stip. Fact No. 26.

3     **2.**   **The Estate's Accusations**

4     The Estate accuses Ocwen of falsely stating in its November 2015 letter that the

5  Insurance Loss Department learned of the "hazard claim" on April 13, 2015, but the

6  Estate offers no evidence that Ocwen's Insurance Loss Department learned of the "hazard

7  claim" on a different date.  The Insurance Loss Department could not have known about

8  the "hazard claim" before it was made, which was undisputedly on March 11, 2015, and

9  its statement that it was advised of the "hazard claim" about one month later is consistent

10  with the record.  Indeed, the Estate's attorney, James Jameson, has declared, under oath,

11  that notwithstanding his June 2014 letter, Ocwen's "single point of contact" for the

12  account, Matthew Rosendahl, stated in a telephone call on March 4, 2015, that Ocwen

13  had had no prior notice of the fire damage.  Jameson Decl. at ¶ 9 (docket no. 46).  Even

14  if, as the Estate suggests, Ocwen earlier learned about the fire and/or the fire damage,

15  such knowledge did not render false the recitation about when the Insurance Loss

16  Department became aware of the "hazard claim."

17     Similarly, the Estate's contention that Ocwen unfairly required that a form be

18  signed by Verl Brantner as a condition precedent to disclosing loan information to the

19  Estate's attorney is not supported by the record.  The Estate simply mischaracterizes the

20  authorization form that Ocwen provided.  The form indicates in two separate places that

21  the account at issue was associated with the "VERL A. BRANTNER **ESTATE**," thereby

22  acknowledging that Verl Brantner was deceased and could not be expected to execute the

23

1  document.  *See* Ex. N to Pierson Decl. (docket no. 163) (emphasis added); *see also* Ex. C

2  to Jameson Decl. (docket no. 46) (establishing, contrary to the Estate's assertion, that

3  Ocwen asked for "written permission from the executor of the estate" before releasing

4  information to the Estate's attorney).  Although the authorization form also indicates that

5  "[a]ll borrowers on the Note must sign," *see* Ex. N to Pierson Decl. (docket no. 163),

6  this admonition must be considered in context as meaning that, if someone other than

7  Verl Brantner had been a borrower on the loan, the other person would also have needed

8  to authorize Ocwen to disclose account information to the Estate's lawyer.  Neither the

9  form nor any evidence proffered by the Estate supports the accusation that Ocwen

10  unreasonably required a dead person to provide a signature.[10]

11     The Estate also fails to support its assertion that Ocwen falsely stated the Estate

12  was required to pay almost $30,000 as a condition precedent to applying the insurance

13  proceeds to the unpaid balance of the loan.  In making this allegation, the Estate does not

14  cite any document signed by, or oral statement attributable to, Ocwen, but rather an

15  affidavit executed by Irene Brantner.  *See* Pl.'s Resp. at 18 (docket no. 162) (citing Ex. U

16

17  _____

18  [10] The Estate expresses exasperation with Ocwen's response on July 15, 2014, indicating that the
    authorization form had not been completed correctly.  *See* Ex. F to Jameson Decl. (docket

19  no. 46).  Ocwen, however, had legitimate reasons for rejecting the executed form.  When Irene
    Brantner signed it, she was not yet the personal representative of the Estate.  Moreover, she did

20  not indicate next to or below her signature that she was acting in her capacity as Verl Brantner's
    heir.  *See* Ex. N to Pierson Decl. (docket no. 163).  Given the absence of such explanation or any
    accompanying materials establishing Irene Brantner's authority to execute documents on behalf

21  of the Estate, the Court concludes, as a matter of law, that Ocwen acted reasonably in again
    seeking a legally valid agreement to release loan information.  Moreover, nothing about this

22  conduct demonstrates that Ocwen demanded Verl Brantner's signature after his death.

23

to Pierson Decl. (docket no. 163)).  As a matter of law, the affidavit cannot constitute a

representation by Ocwen that could form the basis of a deceptive act claim under the

CPA.  The affidavit merely contains an acknowledgement by the personal representative

of the Estate that the insurance proceeds were insufficient to pay off the loan, and that

another $29,251.67 was needed to accomplish that goal.  *See* Ex. U to Pierson Decl.

(docket no. 163).

Finally, the Estate has proffered no evidence to support its allegation that Ocwen

contracted with unlicensed individuals in India and the Philippines to service loans in

Washington, including the loan at issue in this matter.  The Estate relies solely on a

Consent Order issued by the State of Washington, Department of Financial Institutions,

Division of Consumer Services.  *See* Pl.'s Resp. at 19-23 (docket no. 162) (citing Ex. X

to Pierson Decl. (docket no. 163)).  The Consent Order contains the following Findings

of Fact:

> On or about August 17, 2004, Respondent OLS [Ocwen Loan Servicing,
> LLC] obtained a license from the Department of Financial Institutions of the
> State of Washington (Department) to conduct the business of a consumer
> loan company and continues to be licensed to date.

> Respondent OLS has represented to the Department that it is the servicer or
> sub-servicer for all Washington loans subject to this Consent Order and that
> all "servicing" as defined by the Act is conducted by OLS or Ocwen
> Mortgage Servicing, Inc. employees from Washington licensed locations.

Consent Order at ¶¶ 1.1 & 1.7, Ex. X to Pierson Decl. (docket no. 163).  All other

Findings of Fact set forth in the Consent Order primarily concern entities other than

Ocwen Loan Servicing, LLC, which is the only defendant in this case.  *See id.* at ¶¶ 1.2-

1.6 (only ¶ 1.5 even mentions OLS).  The Consent Order further sets forth the following

agreement:

> **No Admission of Liability.**  The parties intend this Consent Order to fully
> resolve the matters alleged herein and agree that Respondents neither admit
> nor deny any wrongdoing by its entry.

*Id.* at 3, ¶ C.  Thus, contrary to the Estate's contention, the Consent Order, even if

admissible under the standards articulated in Federal Rule of Evidence 408, does not

prove (or even raise any question) that Ocwen used unlicensed contractors in India or the

Philippines to service the loan secured by the Arlington residence.

Because the foregoing accusations are unsupported by the record, the Court need

not further analyze whether they support either the "per se" or the "capacity to injure"

theory of CPA liability and, as to these unsubstantiated assertions, Ocwen is entitled to

summary judgment.  As a result, the Estate's CPA claim has been narrowed to the

following remaining allegations:

- Ocwen failed to comply with Federal Housing Administration ("FHA")
  guidelines;

- Ocwen unfairly approved foreclosure on the loan shortly after the fire;

- Ocwen failed to promptly assert a claim for hazard insurance proceeds;

- Ocwen failed to dispute QBE's computation of the amount due under the
  policy;

- Ocwen unfairly delayed reinstatement of the loan; and

- Ocwen failed to negotiate in good faith.[11]

---

[11] The Estate's claim that Ocwen failed to negotiate in good faith sounds in contract, not
statutory tort.  The Estate cites no provision of the Consumer Loan Act or the Consumer

1   The Court now turns to the question of whether the first five of these acts or omissions

2   establish a violation of the Consumer Loan Act for purposes of the "per se" method of

3   proving a CPA claim.  The Court first analyzes the Estate's reliance on a CLA regulation

4   and then examines each of the statutory provisions cited by the Estate.

5           **3.      "Per Se" Theory**

6                   **a.      FHA Guidelines**

7           As indicated earlier, the Estate invokes WAC 208-620-900(1), which transforms a

8   violation of an applicable federal law, regulation, or program into a violation of the

9   Consumer Loan Act.  The federal program on which the Estate relies concerns mortgages

10  insured by the Federal Housing Administration.  As part of this program, the FHA

11  requires mortgagees to "take necessary steps to ensure that hazard or flood insurance

12  claims are filed and settled as expeditiously as possible."  U.S. Dep't of Housing &

13  Urban Development ("HUD") Handbook 4000.1, FHA Single Family Housing Policy

14  Handbook, at ¶ III.A.1.h.iii(A), Ex. H to Pierson Decl. (docket no. 149).  These FHA

15

16

_____

17  Protection Act that imposed a duty on Ocwen to negotiate concerning the amounts owed under

18  the terms of the Note and Deed of Trust at issue in this matter.  The type of payments required to
    reinstate and/or pay off the loan are set forth in the documents executed by Verl Brantner, and

19  the Estate articulates no theory under the CPA that would have forced Ocwen or the lender to
    forego the benefits of the contractual bargain struck in October 2011.  Moreover, although Irene

20  Brantner and the Estate's lawyer might not have comprehended Ocwen's offer of compromise at
    the time, Ocwen did indicate in December 2015 that it would accept roughly a 46% discount on

21  the remaining balance of the loan after crediting the insurance proceeds, if the amount due was
    paid by late January 2016.  The Estate's "failure to negotiate" claim is not cognizable under the

22  CPA and is inconsistent with the record.  Thus, Ocwen is entitled to summary judgment as to this
    claim, which is DISMISSED with prejudice.

23

ORDER - 20

guidelines, however, prohibit mortgagees from applying "insurance proceeds payable for home damages to arrearages and/or reduction of the unpaid principal balance" unless:

- the amount of the proceeds exceeds the costs to repair the damages to the home; or

- the insurance proceeds are insufficient to repair the home damages based on a certified repair estimate, and the Borrower is unable to demonstrate that they have additional funds from other sources to complete the repairs.

*See id.* at ¶ III.A.1.h.iii(D).

Like other HUD guidelines and regulations, Handbook 4000.1 does not create a private right of action.  *See Umouyo v. Bank of Am., N.A.*, No. 2:16-CV-1576, 2019 WL 1568423, at *6 (W.D. Wash. Apr. 11, 2019); *Dietz v. Quality Loan Serv. Corp. of Wash.*, No. C13-5948, 2014 WL 1245269, at *3 (W.D. Wash. Mar. 25, 2014) (indicating that "HUD regulations do not create an implied cause of action for damages, but may be used only defensively as an affirmative defense to a judicial foreclosure action instituted by the creditor"); *see also Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 360 (5th Cir. 1977) (explaining that HUD handbooks are not promulgated for the benefit of mortgagors, but for "HUD-approved mortgagees in servicing HUD-insured home mortgages," and that HUD guidelines address only "the relations between the mortgagee and the government, and give the mortgagor no claim to duty owed nor remedy for failure to follow").  Because the provisions of Handbook 4000.1 impose no obligations on the part of mortgagees toward their mortgagors,[12] the Estate (as successor to a

---

[12] The Estate's argument that Ocwen should be deemed to have admitted the HUD guidelines applied and required it to "take necessary steps to ensure that fire insurance claims were filed and settled as expeditiously as possible," *see* Pl.'s Mot. at 5 (docket no. 148) (quoting Requests for

mortgagor) may not premise a CPA claim, which itself is based on a violation of a regulation promulgated under the Consumer Loan Act, on a failure to comply with HUD guidelines.

Even if, however, the provisions of Handbook 4000.1 are actionable in a mortgagor's suit for damages, they do not support the Estate's claim that Ocwen's handling of the insurance claim and proceeds constituted a violation of the CPA.  The Estate has made no showing that either of the criteria for crediting the insurance proceeds toward the principal of the loan were ever met, and thus, any lack of effort by Ocwen in obtaining the insurance funds did not delay reinstatement of the loan and cannot, as a matter of law, be deemed a violation of the FHA guidelines.  As to the Estate's CPA claim based on WAC 208-620-900(1) and the quoted paragraphs of Handbook 4000.1, Ocwen's motion for summary judgment is GRANTED, the Estate's motion for partial summary judgment is DENIED, and the claim is DISMISSED with prejudice.

### b.   Scope of Consumer Loan Act (RCW 31.04.025)

In support of its "per se" theory, the Estate appears to rely on RCW 31.04.025(1), which contains no specific requirements or restrictions.  This provision instead defines

---

Admission Nos. 2 & 3), lacks merit.  A party may propound a request to admit certain "facts, the application of law to fact, or opinions about either."  *See* Fed. R. Civ. P. 36(a)(1)(A).  Whether a federal guideline creates a particular duty is a pure issue of law and not a proper subject of a Rule 36 request for admission.  *See*, *e.g.*, *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 1 (D.D.C. 2006).  Ocwen reasonably objected to Requests for Admission Nos. 2 and 3 as calling for a legal conclusion or expert opinion.  *See* Ex. K to Pierson Decl. (docket no. 149).  No basis exists for striking Ocwen's responses or for treating Ocwen as having admitted the matters set forth in the discovery requests at issue.  *See* Fed. R. Civ. P. 36(a)(6).

1    the scope of the Consumer Loan Act; it applies to loans made by licensees to residents of

2    Washington, but has 13 enumerated exceptions.  *See* RCW 31.04.025(1) & (2)(a)-(m).

3    The Estate does not explain how Ocwen's alleged misconduct violated RCW 31.04.025.

4    Thus, as to this provision, Ocwen is entitled to summary judgment, and the Estate's CPA

5    claim premised on RCW 31.04.025 is DISMISSED with prejudice.

6              **c.**        **Servicing Requirements (RCW 31.04.290)**

7          The "per se" CPA claim was originally predicated on RCW 31.04.290(1)(b), (c) &

8    (e), as well as WAC 208-620-900(3)(c), which the Ninth Circuit held did not apply to

9    Ocwen's alleged mishandling of the hazard insurance claim and proceeds.  *See* 799 Fed.

10   App'x at 553-54.  The Estate now relies on RCW 31.04.290(1)(d), which requires that a

11   servicer "provide a written statement to the borrower within fifteen business days of

12   receipt of a written request from the borrower."  RCW 31.04.290(1)(d)(ii).  To constitute

13   a "written request from the borrower," the document must include "the name and account

14   number, if any, of the borrower, a statement that the account is or may be in error, and

15   sufficient detail regarding the information sought by the borrower to permit the servicer

16   to comply."  *Id.*

17         The Estate's reliance on RCW 31.04.290(1)(d) is misplaced for two alternative

18   reasons.  First, the Consumer Loan Act imposes obligations on a servicer relating to the

19   servicing of a loan, not to efforts to recoup and apply insurance proceeds.  *See* 799 Fed.

20   App'x at 554.  For the same reasons that the Ninth Circuit reversed and remanded this

21   matter for further proceedings, the Estate's "per se" CPA claim related to

22   RCW 31.04.290(1)(d) cannot survive Ocwen's motion for summary judgment.

23

ORDER - 23

1          Second, even if subsection (1)(d) applied, the Estate has presented no evidence

2   that Ocwen violated the statute by failing to timely respond to a written request from a

3   borrower.  "Borrower" is defined as "any person who consults with or retains a licensee

4   or person subject to this chapter in an effort to obtain, or who seeks information about

5   obtaining[,] a loan [or a residential mortgage loan modification], regardless of whether

6   that person actually obtains such a loan . . . .  [or] a residential mortgage loan

7   modification."  RCW 31.04.015(4).  For purposes of its review in connection with

8   RCW 31.04.290(1)(c), which governs the payment of taxes, insurance premiums, and

9   the like from escrow accounts, the Ninth Circuit assumed without deciding that the

10  Estate was a "borrower" within the meaning of the Consumer Loan Act.  *See* 799 Fed.

11  App'x at 553.  The Court does not make the same assumption with respect to any

12  written requests to which responsive written statements might have been owed under

13  RCW 31.04.290(1)(d).

14         Neither of the letters that might qualify as written requests were from a person

15  who consulted with or retained a licensee or person subject to the CLA in an effort to

16  obtain a loan or information about obtaining loan.  Rather, the letters were authored by an

17  attorney who advised that he represented the estate of a borrower.  *See* Ex. O to Pierson

18  Decl. (docket no. 163); Ex. G to Jameson Decl. (docket no. 46).  At the time of the first

19  letter, however, in June 2014, the Estate had not yet been formally created, and Ocwen

20  had not received written authorization to provide loan information to a third party like the

21  Estate's lawyer.  Moreover, the first letter, which was sent to the wrong address, did not

22  indicate that the account "is or may be in error," but rather stated an assumption that

23

insurance proceeds had been paid to Ocwen and requested that the remaining balance of such funds be forwarded.  Ex. O to Pierson Decl. (docket no. 163).  This demand could not, of course, be satisfied because, at the time, no insurance claim had been made, and no payment under the hazard policy had been received by Ocwen.  The Court concludes, as a matter of law, that the June 2014 letter did not constitute a "written request from a borrower" and did not require Ocwen to provide a written statement containing the information described in RCW 31.04.290(1)(d)(ii)(A)-(D).

The second letter, dated February 19, 2015, which was also mailed to an incorrect address, enclosed copies of the Letters of Administration issued to Irene Brantner and a General Power of Attorney executed by Irene Brantner, which appointed James Jameson as administrator of the Estate; the letter also reflected the Estate's attorney's mistaken "understanding that Ocwen received insurance proceeds from that [fire] loss," and inquired about the remaining loan balance.  _See_ Ex. G to Jameson Decl. (docket no. 46). Within less than 15 days, on February 26, 2015, Ocwen provided two written statements, as arguably required by RCW 31.04.290(1)(d)(ii).  In one response, Ocwen indicated that it had updated its records to reflect Irene Brantner as the executor of the Estate and James Jameson as a third party authorized to receive information about the loan, and it suggested that questions about hazard claim funds be directed to the Loss Draft Department at the telephone numbers and/or address provided.  Ex. L to Pierson Decl. (docket no. 163 at 82).  In the other response, Ocwen set forth the exact amount required

1  to reinstate the loan[13] and provided contact information and the name of the "relationship

2  manager" assigned to the account.  *See* Ex. K to Pierson Decl. (docket no. 163).  The

3  adequacy of Ocwen's response is evidenced by the fact that Jameson first spoke with the

4  relationship manager (Rosendahl) less than a week later, on March 4, 2015.  *See* Ex. L to

5  Pierson Decl. (docket no. 163 at 84); Jameson Decl. at ¶ 9 (docket no. 46).  The record

6  simply does not support the Estate's contention that, after receiving the February 2015

7  letter, Ocwen failed to comply with subsection (1)(d).  Thus, Ocwen is entitled to

8  summary judgment as to the Estate's "per se" CPA claim premised on violation of

9  RCW 31.04.290(1)(d), and that claim is DISMISSED with prejudice.

10                    **d.       Fraudulent, Unfair, or Deceptive Acts (RCW 31.04.027)**

11         The Estate also asserts that Ocwen committed a "per se" CPA violation by

12  breaching RCW 31.04.027(1)(a) & (b).  Together, these subsections prohibit fraudulent,

13  misleading, unfair, or deceptive practices.  *See supra* note 4.  With respect to fraud, the

14  Estate has proffered no evidence.  The Court therefore focuses on the misleading and

15  "unfair or deceptive" portions of these statutes.  The Consumer Loan Act does not define

16  "unfair or deceptive" acts, but Washington's Department of Financial Institutions

17  ("DFI") has enumerated 24 types of behavior that qualify.  *See* WAC 208-620-550.  None

18  of Ocwen's alleged misdeeds are on DFI's list of "unfair or deceptive" conduct.  *See id.*

19

20  _____

21  [13] Ocwen had been providing to the Estate on a monthly basis a Mortgage Account Statement
setting forth the principal balance owed on the loan, detailing the components of the monthly
payments, and showing the total in arrears.  *See* Exs. B & P to Jameson Decl. (docket no. 46);

22  *see* Ex. L to Pierson Decl. (docket no. 163).

23

1    Moreover, none of the remaining accusations against Ocwen involve false (*i.e.*,

2    misleading or deceptive) statements.  Rather, the balance of the Estate's allegations

3    concern acts or omissions that it characterizes as unfair.  The Estate, however, cites no

4    authority for the proposition that, after the loan had been in default for about three

5    months and no payment had been received for roughly five months, Ocwen acted unfairly

6    in approving foreclosure on the loan.  Indeed, given the circumstances, the Deed of Trust

7    provided Ocwen the right to commence foreclosure procedures on behalf of the lender.

8    *See* Deed of Trust at ¶¶ 9 & 18, Ex. 1 to Wright Decl. (docket no. 151).

9    Similarly, the Estate provides no basis for asserting that Ocwen's handling of the

10   insurance claim and proceeds was unfair[14] within the meaning of the Consumer Loan

11   Act, which applies to the making and servicing of loans, not the procurement of insurance

12

13   _____

14   [14] The Estate's complaints about the unfairness of Ocwen's conduct ignore five key points.  First,
     if Ocwen had not force-placed the hazard policy, then no insurance proceeds, which are the focus
15   of this lawsuit, would have been available when the house was destroyed by fire; Ocwen's
     actions protected both its own and the Estate's interest in the Arlington property.  Second, any
16   delay between the date of the fire (March 2014) and the date the Letters of Administration were
     issued to Irene Brantner (February 2015) cannot be attributed to Ocwen, which could not have
17   taken any action with respect to any insurance proceeds, other than to suspend the funds, even if
     available before February 2015, because it could not have obtained the requisite authorization
18   from a duly-appointed personal representative for the Estate.  Third, any delay between the date
     of the hazard claim (March 2015) and the date QBE paid the insurance benefits (September
19   2015) cannot be imputed to Ocwen, which had no control over QBE's investigation, coverage
     determination, or computation of loss.  Fourth, Ocwen was required to pause in February 2016,
20   and keep the insurance funds in suspense, after receiving a letter indicating that the Estate wished
     to review its "options regarding rebuilding the subject property with insurance benefits."  *See*
21   Ex. 11 to Wright Decl. (docket no. 151).  Fifth, as evidenced by James Jameson's undisputed
     communication with QBE to alert it about the fire damage, the Estate was not required to wait
22   for Ocwen to make an insurance claim and could have contacted QBE directly anytime between
     the date of the fire (March 2014) and the date QBE opened a hazard claim (March 2015).

23

ORDER - 27

1  funds.[15]  *See* RCW 31.04.025(1); *see also Estate of Brantner*, 799 Fed. App'x at 553-54.

2  The Estate cannot, as a matter of law, prove that Ocwen's conduct relating to the

3  foreclosure approval and/or the hazard claim and proceeds fell within the rubric of

4  behavior barred by the RCW 31.04.027(1)(a) & (b).  As to the Estate's "per se" CPA

5  claim brought under those provisions, Ocwen is entitled to summary judgment, and the

6  claim is DISMISSED with prejudice.

7    **4.    Capacity to Injure**

8    With respect to the Estate's **non** per se CPA claim, Ocwen contends that the Estate

9  cannot prove the "public interest" element because this matter is a private dispute that

10  affects only the Estate and Ocwen.  A private dispute involving a consumer transaction

11  (for example, purchasing an automobile, a mobile home, or even wheat seed) might be of

12  public interest when:  (i) the alleged acts were committed in the course of the defendant's

13  business; (ii) the acts were part of a pattern or generalized course of conduct; (iii) the acts

14  were repeatedly committed prior to the act involving the plaintiff; (iv) a "real and

15  substantial potential" exists for repetition of the defendant's conduct involving the

16  ———————————————

17  [15] The Estate contends that Ocwen failed to recognize and dispute QBE's miscalculation of the
    amount owed for the hazard claim, which should have been policy limits ($156,033.00) and not

18  the replacement cost reduced by depreciation and the deductible ($132,348.33).  The Estate,
    however, cites no authority for the proposition that, as a loan servicer, Ocwen was required to

19  have insurance expertise or had a duty under the Consumer Loan Act to expend resources to
    fight with QBE over the difference between these numbers ($23,684.67).  Moreover, the Estate

20  sued QBE in this action and then reached a settlement, the terms of which have not been
    disclosed to the Court, and the Estate must be viewed as having been made whole with respect to
    any additional amount owed under the hazard policy.  *See* Stip. Mot. (docket no. 37); *see also*

21  Minute Order (docket no. 38) (dismissing the Estate's claims against QBE).  The Estate simply
    has not demonstrated that Ocwen's acquiescence in QBE's "actual cash value" figure violated

22  the Consumer Loan Act.

23

1    plaintiff; and/or (v) with respect to acts occurring in a single transaction, many consumers

2    were or are likely to be affected by it.  *See* *Hangman Ridge*, 105 Wn.2d at 790.

3          Other types of private disputes can garner public interest if "additional plaintiffs

4    have been or will be injured in exactly the same fashion," as measured by the following

5    factors:  (i) whether the alleged acts were committed in the course of the defendant's

6    business; (ii) whether the defendant advertised to the public in general; (iii) whether the

7    defendant actively solicited the particular plaintiff, thereby indicating potential

8    solicitation of others; and (iv) whether the plaintiff and the defendant occupy unequal

9    bargaining positions.  *Id.* at 790-91.  The factors for both consumer transactions and other

10   types of private disputes are neither conjunctive nor dispositive; not all need be met and

11   no one factor alone decides the issue.  *Id.* at 791.

12         On appeal, the Ninth Circuit recognized that the Estate had presented no evidence

13   and no argument at trial that the public has an interest in the parties' private dispute.  *See*

14   799 Fed. App'x at 554.  Although the Estate amended its operative pleading, the status of

15   its "public interest" showing has not changed.  In the absence of a viable "per se" claim,

16   which would obviate the need to separately establish the public interest element of its

17   CPA claim, the Estate cannot prove its case.  To the extent that servicing of the loan at

18   issue is considered a consumer transaction, the Estate has offered no evidence that

19   Ocwen's alleged mishandling of the insurance claim and proceeds or other misbehavior

20   was part of a pattern or generalized course of conduct, had been repeatedly (or even

21   previously) committed, involved a "real and substantial potential" for repetition, or, as a

22   standalone incident, affected or was likely to affect many consumers.  Indeed, the Estate

23

1   denies that these factors are part of its burden of proof at trial.  *See* Pl.'s Resp. at 16

2   (docket no. 162).

3           Similarly, with respect to the factors concerning other types of private disputes,

4   the Estate has presented no relevant, admissible evidence.  In an effort to demonstrate

5   that Ocwen advertises to the public in general, the Estate cites to the opening statement of

6   Ocwen's trial counsel, who began with "Ocwen's tagline is, 'Helping homeowners is

7   what we do.'"  *See* Pl.'s Resp. at 15 & n.24 (docket no. 162) (citing Ex. Q to Pierson

8   Decl. (docket no. 163) (Tr. (Oct. 29, 2018) at 103:23)).  Ocwen's lawyer further indicated

9   that the jurors would "see that tagline repeated, consistently, in all of the letters [they]

10  will see from Ocwen."  Tr. (Oct. 29, 2018) at 103:24-25, Ex. Q to Pierson Decl. (docket

11  no. 163).  Ocwen's attorney's comments at trial are not evidence.  *See*, *e.g.*, Instruction

12  No. 5 (docket no. 75).  Moreover, use of a "tagline" on private correspondence does not

13  constitute advertisement to the public.  Ocwen is not selected as a loan servicer by

14  borrowers or mortgagors, but rather by various lenders, and the Estate has presented no

15  evidence that Ocwen advertises to the public generally to obtain clients.  The Estate was

16  not itself actively solicited, but rather was forced to interact with Ocwen upon the death

17  of Verl Brantner, and the Estate has provided no basis for believing that Ocwen might

18  solicit other borrowers, mortgagors, or their successors with the aim of inhibiting their

19  ability to procure insurance proceeds and/or reduce the principal balance of their loans.

20          A common factor for both consumer transactions and other types of private

21  disputes is whether the alleged acts were committed in the course of the defendant's

22  business.  Even this factor does not align in the Estate's favor.  Ocwen's business is

23

1   servicing loans.  Ocwen is not in the business of making insurance claims or disputing an

2   insurer's calculation of the amount owed under a policy.  These activities, however, are

3   the crux of the Estate's CPA claim against Ocwen.  The only factor that weighs on the

4   Estate's side of the ledger is the parties' unequal bargaining positions, but this fact alone

5   does not establish the requisite public interest to transform this private dispute into a

6   CPA claim.  *See* *Brutsky v. Capital One, N.A.*, No. C17-491, 2018 WL 513586, at *6

7   (W.D. Wash. Jan. 23, 2018) (ruling that the plaintiffs' allegations of unfair acts

8   concerning mortgage servicing and the defendant's involvement in an "enormous

9   number" of mortgages nationwide failed to establish that the defendant's actions affected

10  the "general borrowing public" or that the defendant's conduct was not unique to its

11  interaction with the plaintiffs).  In failing to keep the loan current after Verl Brantner

12  died, the Estate has tragically dug a financial hole.  The situation did not, however, result

13  from any unfair or deceptive act or practice that affected the public interest.  Ocwen is

14  entitled to summary judgment as to the Estate's **non** per se CPA claim, and such claim is

15  DISMISSED with prejudice.

16  **Conclusion**

17          For the foregoing reasons, the Court ORDERS:

18          (1)     Ocwen's motion for summary judgment, docket no. 150, is GRANTED, the

19  Estate's motion for partial summary judgment, docket no. 148, is DENIED, and all of the

20  Estate's claims are DISMISSED with prejudice;

21          (2)     The pending motions to exclude certain expert opinions and testimony,

22  docket nos. 154 and 156, are STRICKEN as moot;

23

(3)     The Clerk is directed to enter judgment consistent with this Order and to send a copy of the Judgment and this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 20th day of July, 2021.

Thomas S. Zilly
United States District Judge

ORDER - 32